Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, JOHN TASKER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN TASKER, on behalf of himself and all similarly situated persons,<br><br>          Plaintiff,<br><br>v.<br><br>THE ASSOCIATED PRESS, a New York not-for-profit corporation,<br><br>          Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

1

Plaintiff JOHN TASKER ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant THE ASSOCIATED PRESS, a New York not-for-profit corporation ("Defendant" or "The Associated Press"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.      NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.apnews.com (the "Website"), a website that Defendant provides for public access and use.

2.      During his use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications and reveal his content interests.

3.      Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was browsing and/or the referrer URLs reflecting prior navigation, which were transmitted to the Third Parties during the page-load process itself.

4.      As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including identity resolution, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising and real-time bidding.

5.      Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendant has done so from prior to the beginning of the class

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

period in this case and continuously through to today and ongoingly.

## II.   GENERAL ALLEGATIONS

6.   A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

7.   When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, referrer URLs reflecting prior navigation, session-level identifiers, and browser and device characteristics.

8.   When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- The Comscore Tracker
- The LiveIntent Tracker
- The Trade Desk Tracker
- The Facebook/Meta Tracker

9.   The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties."

10.   The Trackers are operated by distinct third parties, including Comscore, Inc. (also branded as Scorecardresearch, as to the Comscore audience-measurement tracker), LiveIntent, Inc. (as to the LiveIntent tracker), The Trade Desk, Inc. (as to the Trade Desk programmatic-advertising tracker), and Meta Platforms, Inc. (as to the Facebook/Meta tracker) (collectively, the "Third Parties"). Defendant knowingly embeds and deploys the Trackers on the Website to facilitate the third parties'

3

interception of the contents of users' electronic communications.

11.     Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers upon page load and navigation. As a result, Defendant causes the interception and transmission of the contents of users' electronic communications with the Website to servers controlled by the Third Parties. Defendant's conduct is intentional and coordinated, as the Trackers operate pursuant to Defendant's deliberate configuration and are not necessary to render the Website's core content or functionality.

12.     The third-party tracking code executed contemporaneously with each page load and navigation event initiated by Plaintiff's browser. As the browser initiated each HTTP request to retrieve Website content, embedded scripts automatically caused the interception and transmission of the contents of users' communications with the Website to remote third-party endpoints during the page-load process itself, before the requested page finished rendering and without any user interaction or authorization.

13.     Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

14.     Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

### III.   PARTIES

15.     Plaintiff JOHN TASKER is a California citizen residing in San Bernardino County, California, and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period including but not limited

to on April 28, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

16. The Associated Press is a New York not-for-profit corporation that owns, operates, and controls the Website, an online news platform through which The Associated Press publishes breaking news reporting, photographs, video, and editorial coverage of national and international news, politics, business, health, science, sports, entertainment, and other topics for readers nationwide.

17. Defendant maintains its principal offices in New York, New York. Through the Website and related digital platforms, The Associated Press conducts news, media, and publishing business nationwide and serves readers in California and throughout the United States.

### IV.   JURISDICTION AND VENUE

18. The Associated Press is subject to personal jurisdiction in this District under Federal Rule of Civil Procedure 4(k)(1)(A) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10, which authorizes the exercise of jurisdiction on any basis not inconsistent with the United States or California Constitutions.

19. The Associated Press has cultivated California as a significant market for its news reporting, editorial content, and digital media products. The Website serves as a primary digital channel through which The Associated Press distributes its breaking news, articles, photographs, and video coverage to California readers, and The Associated Press publishes extensive California-focused news coverage directed at California audiences.

20. In furtherance of those operations, The Associated Press entered into and maintained commercial partnerships with California-headquartered data and advertising companies, including The Trade Desk, Inc., headquartered in Ventura, California, and Meta Platforms, Inc., headquartered in Menlo Park, California.

///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

21.     Through those partnerships, The Associated Press embedded third-party tracking technologies into the Website that transmit California users' communications to data infrastructure and servers operated by California-headquartered companies. Plaintiff, a California resident, accessed the Website from California; the tortious interception of his communications occurred on his device in California; and the intercepted data flowed in part to servers operated by The Trade Desk, Inc., and Meta Platforms, Inc., which operate from California, and to servers operated by other Tracker companies. Plaintiff's claims arise directly from The Associated Press's purposeful direction of its Website and embedded data-collection systems at California residents and its use of California-based infrastructure to capture and exploit their private communications.

22.     The Associated Press deliberately reached out beyond its home state of New York by knowingly installing the Comscore, LiveIntent, Trade Desk, and Facebook/Meta Trackers onto unsuspecting California users' devices so that it could later use and monetize the data it obtained from those Trackers, in a manner that was neither random, isolated, nor fortuitous.

23.     The Associated Press's own Privacy Policy confirms the conduct alleged herein. In Section 2 ("Personal Information We Collect"), The Associated Press expressly acknowledges that it and its "Business Partners" automatically collect, among other things, the visitor's "IP address," the "referring page that linked you to our Services," the visitor's "activities on our Services (including browsing and transaction history, pages, content, and ads you view or click on during your use of our Services)." In Section 4 ("Who We Share Your Personal Information With"), The Associated Press acknowledges that it "may sell, share, rent, or otherwise disclose" that information to "Advertising Partners," including "ad networks, exchanges, demand-side platforms (DSPs), supply-side platforms (SSPs), ad servers, and measurement providers," and that it shares "pseudonymous identifiers (e.g., cookie IDs) to support ad targeting, frequency capping, real-time bidding, and campaign analytics." These admitted categories, the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

specific pages a visitor accesses on the Website, the referring pages, and the identifiers tied to them, constitute the substance of the visitor's electronic communications with the Website, and are the same categories of content-level browsing data that the Trackers intercepted from Plaintiff.

24.   The Associated Press's purposeful direction of its tracking infrastructure at California, its commercial partnerships with California-headquartered Trackers, and its admissions in its own Privacy Policy collectively establish that The Associated Press has purposefully availed itself of the privilege of conducting activities in California and has purposefully directed its conduct at California residents.

25.   Plaintiff's claims arise out of and relate to The Associated Press's forum-related conduct. Plaintiff's communications were intercepted on his device in California, while Plaintiff was located in California, by Trackers The Associated Press deliberately embedded on its Website. The interception occurred while Plaintiff was reading content on the Website that The Associated Press published to California audiences, and the intercepted data was routed in part to California-based servers operated by The Trade Desk, Inc., and Meta Platforms, Inc.

26.   Exercising specific personal jurisdiction over The Associated Press in this District comports with constitutional notions of fair play and substantial justice. The Associated Press is an established news and media organization with substantial commercial operations directed at California residents, and The Associated Press cannot reasonably claim surprise or undue burden from being haled into a California federal court to answer claims arising from interception of California residents' communications via Trackers The Associated Press itself embedded on its Website.

27.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

28.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

29.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are over 100 members of the proposed Class, and at least one Class Member is a citizen of a State different from Defendant's state of citizenship, satisfying CAFA's minimal-diversity requirement.

30.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves California residents in this District, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website from his San Bernardino County residence; (3) Plaintiff resides in this District; and (4) Defendant derives substantial revenue from California consumers in this District.

## V.     FEDERAL AND STATE PRIVACY LAWS

### 1.     The California Invasion of Privacy Act (CIPA)

31.     The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

32.     Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

33.     CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein, which implicate traditional interests in personal privacy, constitute concrete injuries sufficient to establish Article III standing.

34.     Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.     The Federal Wiretap Act**

35.     The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

36.     The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

/ / /

9

37. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI.   SPECIFIC ALLEGATIONS

38. During his use of the Website, Plaintiff navigated to the following pages, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications:

- https://apnews.com/article/lgbtq-gender-sexual-orientation-schools-iowa-lawsuit-b1f1eec4ac244c32b4f3a91413f77b9c;
- https://apnews.com/article/belarus-lgbtq-crackdown-lukashenko-gay-rights-d11b2b1341479d6925b1036b4ddfea68;
- https://apnews.com/article/hungary-lgbtq-law-breach-eu-court-7be38f1e903f0492e53eeaee1c828297; and
- https://apnews.com/article/heated-rivalry-lgbtq-3f1eeb5688d060f69a19a4080b44172b.

39. Plaintiff alleges on information and belief that the tracking mechanisms described below operated on the Website during Plaintiff's visits to the URLs identified above and intercepted the substantive contents of his communications with the Website. Beyond the URLs, each Tracker receives, during each of those page loads, the page URLs identifying the content Plaintiff was viewing transmitted as named payload parameters (The Trade Desk in the page field of its bid request; LiveIntent in the pu parameter; Comscore in the c7 parameter; and Facebook/Meta in the dl parameter), and the Referer header identifying the source page. Each of those fields communicates the substance, purport, or meaning of what Plaintiff was reading on the Website, and is therefore content of Plaintiff's electronic communications within the meaning of Cal.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Penal Code § 631(a) and 18 U.S.C. § 2510(8). Each Tracker section below illustrates what occurs during live browser access to those pages.

**1.** *The Trade Desk Tracker*

40. Defendant embedded and deployed a Trade Desk programmatic-advertising bid mechanism on the Website, operated by The Trade Desk, Inc. through its demand-side advertising platform. The Trade Desk mechanism fires automatically when a user visits the Website, transmitting the full URL of each page a visitor views to The Trade Desk's bid endpoint at direct.adsrvr.org, and simultaneously placing or maintaining persistent third-party tracking cookies (TDID and TDCPM) on the visitor's browser at the .adsrvr.org domain. The Trade Desk, Inc. operates one of the largest demand-side platforms in programmatic advertising, using intercepted browsing data for behavioral profiling, audience segmentation, real-time bidding, and interest-based advertising.

41. Figure 1 is a Fiddler Classic raw request capture showing an outbound POST request transmitted to The Trade Desk at direct.adsrvr.org during the load of the Website's article addressing LGBTQ-related school restrictions in Iowa. The request transmits the full page URL in the page parameter in human-readable form and an Origin header identifying apnews.com as the source page. The page parameter contains the exact page URL, establishing content-level tracking.

/ / /

/ / /

/ / /

11

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 1**



42. Figure 2 is a WebPageTest waterfall capture showing requests to The Trade Desk (adsrvr.org) firing automatically during the load of apnews.com/article/hungary-lgbtq-law-breach-eu-court-7be38f1e903f0492e53eeaee1c828297, the Website's article addressing a court ruling on Hungary's anti-LGBTQ legislation. The capture shows a sequence of Trade Desk requests, including direct.adsrvr.org bid requests and match.adsrvr.org cookie-match requests, executing within the page-load window and concurrent with first-party content delivery, without user interaction.

/ / /

/ / /

/ / /

12

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 2**



43.    Figure 3 is a Chrome DevTools Application panel capture showing the browser's cookie storage.  The Cookies panel identifies The Trade Desk's persistent TDID and TDCPM tracking cookies stored on the .adsrvr.org domain, with expiration dates extending into 2027 and SameSite attributes set to None.

**Figure 3**



13

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

44.     The Trade Desk's servers at direct.adsrvr.org returned responses to the Trade Desk requests, including HTTP 200 OK responses, confirming that The Trade Desk received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

45.     The Trade Desk, Inc. and its operators used the intercepted content of Plaintiff's communications with the Website concerning sexual orientation and related sensitive content, including the page URLs (in the page field of the Trade Desk bid request) and the source-page URLs (in the Referer header and OpenRTB site.page field), to build cross-session and cross-site behavioral profiles tied to the persistent TDID identifier stored on the .adsrvr.org domain, and to participate in real-time bidding auctions in which advertisers pay measurable clearing prices for access to audiences identified by precisely this kind of browsing activity. This commercial use of intercepted content is precisely what The Trade Desk programmatic-advertising platform is designed and marketed to accomplish.

46.     The Trade Desk, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted The Trade Desk, Inc.'s interception by embedding and configuring the Trade Desk programmatic-advertising mechanism on the Website. By causing The Trade Desk, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**2.     *The LiveIntent Tracker***

47.     Defendant embedded and deployed a LiveIntent tracking mechanism on the Website, operated by LiveIntent, Inc. through its identity-resolution and people-based marketing platform. The LiveIntent mechanism fires automatically when a user visits the Website, transmitting a persistent device-user identifier and the full URL of each page a visitor views to LiveIntent's servers at rp.liadm.com, and is associated with a persistent third-party tracking cookie on the visitor's browser at the .liadm.com domain.

LiveIntent, Inc. operates one of the largest identity-resolution platforms serving the digital advertising industry, using intercepted browsing data for cross-publisher behavioral profiling, identity resolution, audience segmentation, and people-based ad targeting.

48.     Figure 4 is a Fiddler Classic raw request capture showing an outbound request transmitted to LiveIntent at rp.liadm.com during the load of apnews.com/article/belarus-lgbtq-crackdown-lukashenko-gay-rights-d11b2b1341479d6925b1036b4ddfea68, the Website's article addressing an LGBTQ crackdown in Belarus. The request transmits the visited-page URL in the pu parameter in human-readable form, a persistent device-user identifier in the duid parameter, the publisher domain in the cd parameter, and Origin and Referer headers identifying apnews.com as the source page. The pu parameter transmits the exact page URL to LiveIntent, while the duid parameter links the transmission to LiveIntent's persistent profile of the user across sessions and publishers.

**Figure 4**

/ / /

15

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

49.     Figure 5 is a WebPageTest waterfall capture showing requests to LiveIntent (liadm.com) firing automatically during the load of the Website.  The capture shows a sequence of LiveIntent requests, including idx.liadm.com identity-resolution requests and rp.liadm.com requests, executing within the page-load window and concurrent with first-party content delivery, without user interaction.

**Figure 5**



50.     Figure 6 is a Chrome DevTools Application panel capture showing the browser's cookie storage during the load of apnews.com/article/lgbtq-gender-sexual-orientation-schools-iowa-lawsuit-b1f1eec4ac244c32b4f3a91413f77b9c, the Website's article addressing LGBTQ-related school restrictions in Iowa. The Cookies panel identifies LiveIntent's persistent lidid tracking cookie stored on the .liadm.com domain, with an expiration extending into 2027 and a SameSite attribute set to None.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 6**



51.    LiveIntent's servers returned responses to the LiveIntent requests, including HTTP 200 OK responses, confirming that LiveIntent received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

52.    LiveIntent, Inc. and its operators used the intercepted content of Plaintiff's communications with the Website concerning sexual orientation and related sensitive content, including the page URLs (in the pu parameter) and the source-page URLs (in the Referer parameter), to build cross-session and cross-publisher audience profiles tied to the persistent duid identifier and the lidid cookie, and to supply LiveIntent's identity-resolution infrastructure with people-based identity-resolution and ad-targeting signals derived from that content. This commercial use of intercepted content is precisely what the LiveIntent identity-resolution platform is designed and marketed to accomplish.

53.    LiveIntent, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted LiveIntent, Inc.'s

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

interception by embedding and configuring the LiveIntent tracking mechanism on the Website. By causing LiveIntent, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**3.    *The Comscore Tracker***

54.    Defendant embedded and deployed a Comscore tracking pixel on the Website, operated by Comscore, Inc. (also branded as Scorecardresearch) through its audience-measurement and behavioral-tracking platform. The Comscore pixel fires automatically when a user visits the Website, transmitting Defendant's Publisher/Site ID, the full URL of each page a visitor views, and the page title to Comscore's servers at sb.scorecardresearch.com, and simultaneously placing persistent third-party tracking cookies on the visitor's browser at the scorecardresearch.com domain. Comscore, Inc. operates one of the largest audience-measurement and behavioral-tracking platforms in the United States, using intercepted browsing data for audience measurement, behavioral profiling, audience segmentation, and cross-session and cross-site user tracking.

55.    Figure 7 is a Fiddler Classic raw request capture showing an outbound request transmitted to Comscore (Scorecardresearch) at sb.scorecardresearch.com during the load of apnews.com/article/hungary-lgbtq-law-breach-eu-court-7be38f1e903f0492e53eeaee1c828297, the Website's article addressing a court ruling on Hungary's anti-LGBTQ legislation. The request transmits a Publisher/Site ID in the c2 parameter, the full page URL in the c7 parameter in human-readable form, the page title in the c8 parameter, and a Referer header confirming the source page. The c7 parameter contains the full page URL in human-readable form, establishing content-level tracking, and the c8 parameter transmits the page title to Comscore.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 7**



56.    Figure 8 is a WebPageTest waterfall capture showing requests to Comscore (Scorecardresearch) firing automatically during the load of apnews.com/article/belarus-lgbtq-crackdown-lukashenko-gay-rights-d11b2b1341479d6925b1036b4ddfea68,    the Website's article addressing an LGBTQ crackdown in Belarus. The capture shows Comscore beacon requests to sb.scorecardresearch.com executing within the page-load window and concurrent with first-party content delivery, without user interaction.

/ / /

/ / /

/ / /

19

**Figure 8**



57.    Figure 9 is a Chrome DevTools Application panel capture showing the browser's cookie storage during the load of apnews.com/article/belarus-lgbtq-crackdown-lukashenko-gay-rights-d11b2b1341479d6925b1036b4ddfea68,           the Website's article addressing an LGBTQ crackdown in Belarus. The Cookies panel identifies Comscore's persistent UID and XID tracking cookies stored on the scorecardresearch.com domain, with expirations extending into 2027 and SameSite attributes set to None.

/ / /

/ / /

/ / /

20

**Figure 9**



58.     Comscore's servers at sb.scorecardresearch.com returned responses to each Comscore request, including HTTP 200 OK responses, confirming that Comscore received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

59.     Comscore, Inc. and its operators used the intercepted content of Plaintiff's communications with the Website concerning sexual orientation and related sensitive content, including the page URLs (in the c7 parameter), the page titles (in the c8 parameter), and the source-page URLs (in the Referer header), to build cross-session audience-measurement and behavioral profiles tied to the persistent UID and XID identifiers stored on the scorecardresearch.com domain, and to supply audience-measurement and audience-segmentation signals derived from that content. This commercial use of intercepted content is precisely what the Comscore audience-measurement platform is designed and marketed to accomplish.

60.     Comscore, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured

those communications as they occurred. Defendant aided and abetted Comscore, Inc.'s interception by embedding and configuring the Comscore tracking pixel on the Website. By causing Comscore, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**4.** *The Facebook/Meta Tracker*

61. Defendant embedded and deployed a Facebook/Meta tracking pixel on the Website, operated by Meta Platforms, Inc. through its advertising and audience-targeting platform. The Facebook/Meta pixel fires automatically when a user visits the Website, transmitting the full URL of each page a visitor views and a persistent browser identifier to Meta's servers at www.facebook.com, and is associated with a persistent identifier cookie on the visitor's browser. Meta Platforms, Inc. operates one of the largest advertising and behavioral-profiling platforms in the world, using intercepted browsing data for cross-session and cross-site user tracking, behavioral profiling, audience segmentation, and interest-based advertising.

62. Figure 10 is a Fiddler Classic raw request capture showing an outbound request transmitted to Facebook/Meta at www.facebook.com/tr/ during the load of apnews.com/article/lgbtq-gender-sexual-orientation-schools-iowa-lawsuit-b1f1eec4ac244c32b4f3a91413f77b9c, the Website's article addressing LGBTQ-related school restrictions in Iowa. The request transmits the full page URL in the dl parameter in human-readable form, a persistent browser identifier in the fbp parameter, and a Referer header confirming the source page. The dl parameter contains the exact page URL, establishing content-level tracking.

///

///

22

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 10**



63.    Figure 11 is a Fiddler Classic raw request capture showing an outbound request transmitted to Facebook/Meta at www.facebook.com/tr/ during the load of apnews.com/article/heated-rivalry-lgbtq-3f1eeb5688d060f69a19a4080b44172b,    the Website's article addressing LGBTQ-inclusive hockey. The request transmits the full page URL in the dl parameter in human-readable form, a persistent browser identifier in the fbp parameter, and a Referer header confirming the source page.

/ / /

/ / /

/ / /

23

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 11**



64.     Figure 12 is a Chrome DevTools Application panel capture showing the browser's cookie storage during the load of apnews.com/article/hungary-lgbtq-law-breach-eu-court-7be38f1e903f0492e53eeaee1c828297, the Website's article addressing a court ruling on Hungary's anti-LGBTQ legislation. The Cookies panel identifies the Facebook/Meta _fbp identifier cookie stored on the .apnews.com domain, with a SameSite attribute set to Lax.

/ / /

/ / /

/ / /

24

**Figure 12**



65.     Meta's servers at www.facebook.com returned HTTP 200 OK responses to each Facebook/Meta request, confirming that Meta received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

66.     Meta Platforms, Inc. and its operators used the intercepted content of Plaintiff's communications with the Website concerning sexual orientation and related sensitive content, including the page URLs (in the dl parameter) and the source-page URLs (in the Referer header), to build cross-session and cross-site behavioral profiles tied to the persistent fbp browser identifier, and to enable interest-based advertising targeting based on the intercepted content. This commercial use of intercepted content is precisely what the Facebook/Meta advertising platform is designed and marketed to accomplish.

67.     Meta Platforms, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted Meta

25

Platforms, Inc.'s interception by embedding and configuring the Facebook/Meta tracking pixel on the Website. By causing Meta Platforms, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

## VII.  CLASS ALLEGATIONS

68.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website were intercepted by one or more Trackers between April 28, 2025 and the present.

69.    NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

70.    COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;

26

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

71. TYPICALITY: As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

72. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

73. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII. <u>FIRST CAUSE OF ACTION</u>

### Violations of Cal. Penal Code § 631

### By Plaintiff and the Class Members Against All Defendants

74. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

75. Plaintiff brings this cause of action on behalf of himself and the Class.

76. California Penal Code § 631(a) prohibits any person from willfully and

without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained.

77. The full URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, the Trackers received human readable copies of URL strings in the same HTTP request or response in which the Website servers received it, while that communication was in transit between Plaintiff's browser and the Website.

78. Defendant intentionally configured its website to transmit Plaintiff's and Class members' URL contents to the Trackers, itself received and used those URL contents for audience segmentation and ad targeting, and permitted the Trackers to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies.

79. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX. <u>SECOND CAUSE OF ACTION</u>

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against All Defendants

80. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

81. Plaintiff brings this cause of action on behalf of himself and the Class.

82. 18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

83.   The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' browsing. As described in the preceding tracker-specific allegations, the Trackers intercepted URL contents in real time, in the same HTTP request or response in which the Website's servers received them, while those communications were in transit.

84.   Defendant intentionally configured its website to transmit Plaintiff's and Class members' URL contents to each Tracker, itself received and used those URL contents for audience segmentation and ad targeting, and permitted each Tracker to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to this interception, and no other exception applies.

85.   Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X.   THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against All Defendants

86.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

87.   Plaintiff brings this cause of action on behalf of himself and the Class.

88.   California Business and Professions Code § 17200 prohibits any unlawful,

29

unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

89. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

90. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

91. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Each Tracker enabled by Defendant used that intercepted URL content to build behavioral profiles and to participate in real-time bidding auctions in which advertisers pay measurable clearing prices for access to audiences identified by precisely this kind of browsing activity.

92. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue and RTB clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff

30

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

93.    Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

## XI.    FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against All Defendants

94.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

95.    Plaintiff brings this cause of action on behalf of himself and the Class.

96.    Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

97.    Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

98.    Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting an online news website providing news reporting and editorial content does not expect that the specific pages they browse will be covertly transmitted to multiple

31

separate third-party commercial tracking companies in real time, linked to persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

99.   Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring four third-party tracking technologies on the Website, Defendant caused the real-time, covert interception of the URL contents of Plaintiff's and Class Members' electronic communications and their transmission to third parties where they were linked to persistent cross-session profiles and used for commercial advertising and analytics purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the nature of the news website, the sensitivity of the content browsed, the persistent and cross-platform nature of the identifiers used, and the commercial exploitation of the intercepted data.

100.   As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII.   FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against All Defendants

101.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

102.   Plaintiff brings this cause of action on behalf of himself and the Class.

103.   The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

104.   Defendant intentionally intruded into Plaintiff's and Class Members'

32

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

electronic communications with the Website by deliberately embedding four third-party tracking technologies that intercepted the URL contents of those communications in real time and transmitted them to third parties without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

105. The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the specific content Plaintiff was browsing and transmitted it to multiple third-party commercial entities for advertising targeting and behavioral profiling. The covert and non-consensual nature of the interception, the nature of the Website and the sensitivity of the content browsed, the commercial exploitation of the intercepted browsing activity for advertising and data analytics purposes, and the use of persistent cross-session identifiers to build comprehensive user profiles without disclosure all render the intrusion highly offensive to a reasonable person.

106. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII.  SIXTH CAUSE OF ACTION

### Unjust Enrichment

### By Plaintiff and the Class Members Against All Defendants

107. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

108. Plaintiff brings this cause of action on behalf of himself and the Class.

109. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

110.   Defendant received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation, data licensing benefits, promotional support, or other commercial value. Defendant's arrangement with these tracking operators enabled it to offer analytics, retargeting, and advertising services that generated commercial revenue and business value.

111.   Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendant and its tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

112.   It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

113.   Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense.

## XIV.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq.,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;

3. An order enjoining Defendant from continuing the conduct alleged herein;

4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;

5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;

6. Punitive damages pursuant to 18 U.S.C. § 2520;

7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;

8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;

9. Compensatory and nominal damages for intrusion upon seclusion;

10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;

11. Prejudgment interest;

12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

35

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   May 30, 2026        **LAW OFFICES OF ROSS CORNELL, APC**


By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com


**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com


*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED